Commonwealth ex rel. Leider *v.* Leider, Appellant.

434

Argued June 19, 1967. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, HOFFMAN, and SPAULDING, JJ.

*Samuel Kagle*, with him *Oscar Brown*, for appellant.

*Joseph N. Bongiovanni, Jr.*, with him *Stassen & Kephart*, for appellee.

OPINION BY WRIGHT, J., September 14, 1967:

This is an appeal by David Stephen Leider from an order of the County Court of Philadelphia requiring him to pay the sum of $20.00 per week for the support of a female child, Suzanne Mary, born August 9, 1962. We are not concerned with the amount of the order. The issue before us is whether any order should have been entered against this appellant under the circumstances. There were five hearings in the court below, with extensive testimony. Although counsel for the parties executed a statement of the case under our Rule 37, we have deemed it advisable to review the original record in its entirety.

On November 18, 1965, a petition was filed by Andree M. Leider against David Stephen Leider requesting that an order of support be entered for herself and minor child, Suzanne Mary. On January 13, 1966, the matter was continued upon condition that any order

eventually entered should be retroactive to that date. On February 15, 1966, David Stephen petitioned for an order directing blood tests under the Act of July 13, 1961, P. L. 587, 28 P.S. 307.1 et seq. The blood tests did not exclude David Stephen as the father of Suzanne Mary. The support proceeding ultimately resulted in the order, January 3, 1967, which is the subject of the instant appeal. It will be helpful to briefly summarize the factual situation.

Andree Marie L'Allemand was born on October 7, 1924. She married David Paul McFarland April 8, 1946. Andree MacFarland (now Yost) was born January 22, 1947, David MacFarland was born December 8, 1950, Daniel MacFarland was born July 10, 1956. While living with MacFarland, Andree Marie admittedly "dated" other men. She and MacFarland eventually separated. The opinion below indicates that it was in 1956. However, in a petition for support filed by Andree Marie against MacFarland on August 11, 1961, No. 3600 August Term 1961, she averred that the separation occurred in July of that year. Joint income tax returns were filed until 1961. In any event, MacFarland remained in the general area after the separation and regularly visited his children. At the time of the conception of Suzanne Mary, he resided "about three blocks away". Some time in the fall of 1960 Andree Marie met David Stephen Leider, a college student sixteen years her junior, born November 3, 1940. Shortly thereafter Andree Marie and David Stephen commenced sexual relations. Following the birth of Suzanne Mary, Andree Marie obtained a divorce from MacFarland, January 8, 1963, and married David Stephen, January 17, 1963. While the instant action was pending, Andree Marie and David Stephen were divorced. The court below dismissed the petition for support so far as Andree Marie was concerned, and the order was entered for the support of Suzanne Mary only.

The pivotal issue on this appeal is whether the presumption of legitimacy was overcome. This presumption stands until met with evidence which makes it clearly appear that the husband at the time of conception (MacFarland) was not the father of the child: *Commonwealth v. Carrasquilla*, 191 Pa. Superior Ct. 14, 155 A. 2d 473. The burden is on the Commonwealth to rebut the presumption: *Commonwealth v. Atherton*, 129 Pa. Superior Ct. 64, 194 A. 779. The law is well settled that neither husband nor wife may testify as to nonaccess: *Commonwealth v. Oldham*, 178 Pa. Superior Ct. 354, 115 A. 2d 895; *Cairgle v. American Radiator and Standard Sanitary Corp.*, 366 Pa. 249, 77 A. 2d 439. This court has been faced with a similar problem in a number of cases, of which we will mention the four most recent. In *Commonwealth v. Fletcher*, 202 Pa. Superior Ct. 65, 195 A. 2d 177, and *Commonwealth v. Ludlow*, 206 Pa. Superior Ct. 464, 214 A. 2d 282, it was held that the evidence on the issue of nonaccess was sufficient to rebut the presumption of legitimacy. In *Commonwealth v. Carrasquilla*, supra, 191 Pa. Superior Ct. 14, 155 A. 2d 473, and *Commonwealth v. DiBonaventure*, 206 Pa. Superior Ct. 340, 213 A. 2d 175, it was held that the evidence as to nonaccess was not sufficient to rebut the presumption.

In *Commonwealth v. DiBonaventure*, supra, 206 Pa. Superior Ct. 340, 213 A. 2d 175, Judge JACOBS made the following pertinent statement: "Since the prosecutrix was still married at the time of conception, the Commonwealth was required to assume the burden of rebutting the presumption of legitimacy by sufficient competent proof to sustain a finding beyond a reasonable doubt of nonaccess by her husband. . . Whether it meets this burden depends, of course, on the particular facts of each case". Our analysis of the factual situation in the case at bar, hereinbefore summarized, convinces us that the evidence on the issue of nonaccess

was insufficient to rebut the presumption of legitimacy. As a matter of fact, the testimony plainly establishes that MacFarland had access to Andree Marie throughout the period within which Suzanne Mary was necessarily conceived.

It must be noted that the court below erred in permitting, over timely objection, both MacFarland and Andree Marie to testify as to nonaccess. Reliance was placed solely on two lower court cases for the proposition that, because of the subsequent marriage of Andree Marie and David Stephen, such testimony did not tend to bastardize Suzanne Mary. A statement that the mother of a child was for that reason a competent witness appears in the opinion of the auditing judge in *Schumacher's Estate*, 41 Pa. D. & C. 100. However, the court en banc in that case found it unnecessary to pass upon the competency of the mother to testify, expressly "excluding" the discussion of the auditing judge on this point. The *Schumacher* case was cited as authority in *Commonwealth v. Tucker*, 24 Pa. D. & C. 2d 674. To the extent that the language therein is inconsistent with the established law of this Commonwealth, the *Tucker* case is herewith disapproved.

The order of the court below is reversed.

———

DISSENTING OPINION BY ERVIN, P. J.:

Andree Marie L'Allemand married David Paul McFarland on April 8, 1946. In February of 1960 Andree met David Stephen Leider, a college student 16 years her junior, and shortly thereafter commenced having sexual relations with him. She had a child, Suzanne Mary, born on August 9, 1962. Following the birth of Suzanne Mary, Andree and McFarland were divorced on January 8, 1963 and Andree married David Stephen Leider on January 17, 1963.

The court below ordered David Stephen Leider to pay an order of $20.00 per week for the support of

Suzanne Mary. The majority would reverse the court below because of the rule that neither husband nor wife may testify as to nonaccess. In this connection I would like to repeat what Judge (now President Judge) KLEIN so well stated in *Schumacher's Estate,* 41 Pa. D. & C. 100, at pages 103, 104: "In the face of the many appellate court decisions in this State affirming the rule, I do not have the temerity to challenge it. I do, however, believe that it should be limited to those cases where the direct effect of the testimony is to bastardize the children, for it is only in those cases that the reason for the application of the rule can exist.

. . .

"It was strenuously contended that the mother was not a competent witness because her testimony would tend to bastardize the claimants during the period commencing with their births and ending on the date of her marriage with Harvey Schumacher on June 17, 1921. Admitting that this may be true, I have concluded that it would be improper and unjust to extend the artificial rule in question to the point where it would exclude children from the family line of their natural lawful father and graft them upon the family of a total stranger to them." To the same effect, see *Com. v. Tucker,* 24 Pa. D. & C. 2d 674. I would permit all of the parties and witnesses to testify and leave their credibility to the fact finder. Under the majority's ruling, Andree would undoubtedly be able to go after her first husband for the support of Suzanne, Mary and add her to his own three children to support.

I would affirm the order of the court below.

---

DISSENTING OPINION BY HOFFMAN, J.:

I agree with President Judge ERVIN that testimony of husband or wife as to nonaccess should not be barred

where it will not bastardize the child.

The time has come, however, for a thorough, critical reevaluation of the general rule. I need not here consider the questionable, historical basis for this doctrine. Its origin and development have been carefully explored and analyzed in 7 Wigmore, Evidence §§2063, 2064 (3rd Ed. 1940). Moreover, regardless of the historical justification for the rule, it has, concededly, through repeated citation, become an established part of the substantive law of evidence of this Commonwealth. Nonetheless, the very harsh consequences which arise out of its application demand that we subject it yet again to careful scrutiny.

Various theories have been advanced in support of the doctrine. Some courts have suggested that it is indecent, unseemly, or immoral for husband or wife to testify as to nonaccess. Yet, we permit women to testify as to their own adultery. *Cairgle v. American Radiator and Standard Sanitary Corporation*, 166 Pa. Superior Ct. 621, 74 A. 2d 721 (1950), aff'd., 366 Pa. 249, 77 A. 2d 439 (1951). We permit women to testify in divorce actions as to desertion by their husbands despite the fact that children may have been born in the interim. To hold that a woman's testimony as to her husband's nonaccess is indecent, while testimony as to her own adultery or as to her husband's desertion is not, is hypocritical and flies in the teeth of common sense.

A second argument repeatedly advanced by our courts is that the legitimacy of the child is a matter of great significance, and that, consequently, the child should not be bastardized by the testimony of his parents. The application of this artificial rule, however, tends only to suppress the truth and exclude competent evidence. If the legitimacy of children is of such paramount importance, we should similarly not permit the testimony of third persons in this regard. Yet, we per-

mit the introduction of testimony by strangers while excluding the testimony of husband and wife who are, obviously, in the best position to know and disclose the truth. It is a strange rule of evidence which requires that courts, which are otherwise so zealous in the search for truth, ignore and suppress the most important evidence of all, while relying on the testimony of outsiders.

In this regard, reference should also be made to §21 of the Uniform Reciprocal Enforcement of Support Law, Act of May 10, 1951, P. L. 279, §21, 62 P.S. §2043.21, which contains no such limitation. It provides: "Laws attaching a privilege against the disclosure of communications between husband and wife are inapplicable to proceedings under this act. Husband and wife are competent witnesses to testify to any relevant matter including marriage and parentage."

It appears, therefore, that our legislature, in enacting the Uniform Reciprocal Enforcement of Support Law in this Commonwealth, was not of the opinion that the testimony of husband or wife as to access seriously subverted our public policy. Moreover, there would appear to be no justification for a rule which allows the nonresident defendant husband to testify as to nonaccess, but denies that right to the resident husband.

The most important reason for the abandonment of this rule of evidence is to be found in its harsh, social consequences. The rule has always been envisioned as a method whereby husbands will be prevented from avoiding their responsibility to support their children. Thus, in *People ex rel. Cullison v. Dile,* 347 Ill. 23, 179 N.E. 93 (1931), the Supreme Court of Illinois suggested that the rule was salutary because the husband might otherwise be relieved of the support of the child and that burden would then fall upon the public. I can perceive no justification in a rule which would

require that an individual support a child not his own, regardless of the benefits which may accrue to the public funds. Cf. *Ventresco v. Bushey*, 159 Me. 241, 191 A. 2d 104 (1963).

In point of practical fact, however, the doctrine has often worked to the detriment of the public welfare. Judges who regularly pass on support cases recognize that in a multitude of instances, the doctrine, rather than serving as a sword against the husband has been converted into a shield for the actual father. Particularly among the uneducated lower classes living in the midst of our large urban centers, the marital and family framework has been disrupted in an unusually high percentage of cases. Husbands often separate **from or leave their wives**, without seeking a divorce, and their whereabouts become a matter of conjecture. Subsequently, these wives often give birth to children, after having lived for an extended period with another man, who is clearly the father. Yet the courts, in many instances, find themselves unable to impose a duty of support on the actual father, because the presumption of access cannot be overcome, however remote the possibility might be. Consequently, the duty of support falls upon our public welfare agencies. To compound the unfairness of this situation, if the separated husband ever falls subject to the court's jurisdiction, he becomes liable for support because he too cannot overcome the presumption of access and legitimacy.

This unfair situation has often induced lower courts to take unorthodox action to avoid the harsh consequences of the rule. Thus, in a recent case, a judge of the County Court of Philadelphia found that the mother had failed to overcome the presumption of access. Nonetheless, the court sought to impose a support order on the obvious father by holding that the man stood "in loco parentis" to the child. See *Commonwealth ex rel. Morgan v. Smith*, 209 Pa. Superior

442

Ct. 364, 228 A. 2d 6 (1967) (Per Curiam: Order affirmed, HOFFMAN, J., filed a dissenting opinion, in which MONTGOMERY, J., joined; allocatur granted and appeal allowed, June 12, 1967).

I can find no justification or morality in a rule which tends to absolve the rightful father of his duty of support, while imposing such an obligation upon an innocent husband merely because of his marital relationship. While I do not suggest that we relax the strict standards of proof required in overcoming the presumption of legitimacy, our courts, in making this determination, should not be denied access to the most significant testimony of all, nor should the parties most directly concerned be denied the opportunity to present their cases directly to the court. If decency and morality are considerations, they suggest that the husband and wife be permitted to testify, not that they be silenced by an arbitrary and hypocritical rule of evidence.